1

2

3

4

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

5

6

7

8

9

10

**AQUALLIANCE, et al.,**

                **Plaintiffs,**

        **v.**

**U.S. BUREAU OF RECLAMATION,** *et al.*,

             **Defendants.**

**1:15-CV-754-LJO-BAM**

**REQUEST FOR SUPPLEMENTAL BRIEFING RE CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 45, 48, 49, 50)**

11

12

13

14

15

16

17

18

19

       Plaintiffs[1], various water resource management and conservation organizations, challenge Defendants'[2] "10-year water transfer program to move water from sellers located upstream of the Sacramento/San Joaquin Delta ('Delta') to willing buyers south of the Delta (the 'Project')." ECF No. 16, First Amended Complaint ("FAC") at ¶ 2. Specifically, Plaintiffs assert Defendants violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*, and the California Environmental Quality Act ("CEQA"), Cal. Pub. Res. Code §§ 21000, *et seq.*, by approving the Project's Final Long-Term Water Transfers Environmental Impact Statement/Environmental Impact Report ("the FEIS/R[3]"). Plaintiffs also assert FWS's approval of the Project's Final Biological Opinion

20

---

21

[1] Plaintiffs are AquAlliance, California Sportfishing Protection Alliance, South Delta Water Agency, Central Delta Water Agency, and Local Agencies of the North Delta.

22

23

[2] Defendants are U.S. Bureau of Reclamation ("BOR" or "Reclamation"), San Luis & Delta-Mendota Water Authority (the "Authority"), U.S. Department of the Interior ("Interior"), Sally Jewell, in her official capacity as the former Secretary of the Interior, and U.S. Fish & Wildlife Service ("FWS").

24

25

[3] Under NEPA, the Project's environmental review report is an "Environmental Impact Statement" ("EIS"), whereas it is referred to as an "Environmental Impact Report" ("EIR") under CEQA. The Court will refer to the final version of the document at issue in this case, which purports to satisfy both NEPA and CEQA, as "the FEIS/R" and to the draft version as the "DEIS/R."

26

1   ("BiOp") and Incidental Take Statement ("ITS") violated the Endangered Species Act ("ESA"), 16

2   U.S.C. §§ 1531, *et seq*. FAC at ¶ 1.

3          Before the Court are the parties' cross-motions for summary judgment. ECF Nos. 45, 48, 49, 50.

4   The parties did not request a hearing on the motions and the Court did not set one. The matter became

5   ripe for decision upon the lodging of the last portion of the Administrative Record ("AR") on December

6   2, 2016. Since then, the Court has devoted substantial resources to digesting the parties' complex,

7   overlength briefs (totaling almost 200 pages) and reviewing the thousands of pages of cited material

8   from the AR. In the course of this review, which is not yet complete, the Court has determined that it

9   requires additional information from the parties on several issues related to the manner by which the

10  FEIS/R defines certain baseline conditions against which Project impacts to the environment are

11  measured.[4]

12        1.      **CEQA Challenge to Baseline Treatment of Groundwater Demand**

13         Among the many dozens of issues raised in these cross motions, Plaintiffs argue that models

14  utilized in the FEIS/R violate CEQA[5] because those models ignore consistent, documented historical

15  growth in water supply demand. ECF No. 45 at 23. The models in question are designed to approximate

16  a fixed level of development, with the model more relevant to surface water impacts using a 2005 level

17  of development and another model more relevant to groundwater impacts using a 2010 level of

18  development. AR 27430. "This means that population, land use, and agricultural demands used in the

19  models are representative of demands that existed in those years." *Id.* "These demands are then used

20  with historical hydrology inputs, primarily precipitation, reservoir inflows, and unregulated flows, in

21  model simulations." *Id*. With respect to those aspects of the modeling in the FEIS/R linked to

22  _____

23  [4] The Court notes that the instant request for supplemental briefing may not be the limit of the Court's supplemental inquiries in this case.

24  [5] Because Plaintiffs' brief does not always delineate clearly which arguments are based upon CEQA and/or NEPA, the Court is left with no choice but to scour the briefs for hints in this regard. As this section of Plaintiffs' motion only cites CEQA

25  cases, the Court assumes Plaintiffs raise only a CEQA challenge as to this issue.

26                                                  2

groundwater impacts, the FEIS/R concludes that, even though there have been changes in demand since 2010, the use of 2010 demand levels is appropriate because that model incorporates more recent information relevant to groundwater demand, including land use surveys and precipitation records, designed to make demands vary in each year of simulation, "with higher demands for groundwater in drier years." AR 27430-31. In light of the information incorporated into the model, the FEIS/R further concludes that: "[w]hile there have been changes in demand since 2010, the range of demands simulated . . . is representative of <u>existing</u> conditions in the Sacramento Valley." AR 27431 (emphasis added).

Under CEQA, the determination of the baseline is the first step in the impact review process. *Save Our Peninsula Comm. v. Monterey Cty. Bd. of Supervisors*, 87 Cal. App. 4th 99, 125 (2001). "Environmental conditions may vary from year to year and in some cases it is necessary to consider conditions over a range of time periods." *Id*. "[A]n agency enjoys the discretion to decide, in the first instance, exactly how the existing physical conditions without the project can most realistically be measured, subject to review, as with all CEQA factual determinations, for support by substantial evidence." *San Francisco Baykeeper, Inc. v. California State Lands Comm'n*, 242 Cal. App. 4th 202, 218 (2015) (internal citation and quotation omitted). Under CEQA, a court must "apply the substantial evidence test to conclusions, findings, and determinations, and to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact, and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions." *City of Long Beach v. Los Angeles Unified Sch. Dist.*, 176 Cal. App. 4th 889, 898 (2009). Such a challenge therefore must be rejected if substantial evidence supports the agency's approach and the EIR is not clearly inadequate or unsupported. *Id*.

Therefore, the question is whether the record contains substantial information to support the FEIS/R's conclusion. *See Bakersfield Citizens for Local Control v. City of Bakersfield*, 124 Cal. App. 4th 1184, 1198 (2004) ("Substantial evidence is defined as enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though

other conclusions might also be reached."). Plaintiffs argue that substantial evidence does not support the use of the chosen approach to setting a baseline within the groundwater model, in light of the "backdrop of decades of persistent growth in groundwater demands." ECF No. 45 at 24. Plaintiffs correctly point out that data in the FEIS/R indicates groundwater pumping grew consistently from 1961 (250,000 [Acre Feet ("AF")]) to 2003 (800,000 AF). AR 25625. In light of this trend, Plaintiffs argue that there is no support for the FEIS/R's conclusion that "the range of demands simulated . . . is representative of existing conditions in the Sacramento Valley." ECF No. 45 at 24. Plaintiffs' argument suggests, therefore, that the modeling parameters must be adjusted to account for an overall upward trend in groundwater demand, a trend that (if it persists) presumably could cause the overall "range of demands" in the relevant region(s) to increase over time. In other words, by assuming that the "range of demands" is governed by fixed inputs as of a date certain (2010) that predates the start of the Project, the modeling process fails to account for demand growth that could materially alter the "range of demands" over time. In light of the record evidence cited by Plaintiffs demonstrating a consistent upward trend in groundwater demand, *see* AR 25625, it is reasonable to conclude, in the absence of contrary record evidence, that demand would continue to rise over time, including over the 10 year life of this project. However, apart from the conclusory assertion that "the range of demands simulated . . . is representative of <u>existing</u> conditions in the Sacramento Valley," the Court has been unable to identify record evidence supporting this conclusion.

Because Plaintiffs' cross motions raise so many issues, limiting both their ability to flesh out each issue and the ability of Defendants to respond in a sufficiently detailed manner, the Court believes it will be helpful to receive supplemental briefing to allow further development of the following questions related to the baseline treatment of groundwater demand:

- In light of the record evidence demonstrating a long-term upward trend in groundwater demand, what record evidence exists to support the FEIS/R's apparently contradictory decision to use a fixed level of demand in its modeling efforts? Is there record evidence demonstrating that the

historical trend is not likely to continue or is not likely to be material? Alternatively, is there record evidence demonstrating why any likely changes in demand are encompassed within the "range of conditions" the FEIS/R did consider?

- Among other things, the parties should address directly the FEIS/R's conclusion that "the range of demands simulated in SACFEM2013 is representative of existing conditions in the Sacramento Valley" and whether it is even appropriate to define the baseline using "existing" conditions, rather than by adjusting conditions to reflect changing water demands.

- The Court directs the parties not to rely predominantly on string-citation of page references from AR, as has been the prevalent practice in the briefs filed thus far. The parties must explain why they believe their record citations support their position(s).

## 2.    Analysis of Climate Change Impacts (CEQA and NEPA)

Plaintiffs also argue that the FEIS/R as a whole fails to assess meaningfully impacts associated with ongoing climate change. ECF No. 45 at 25. As to this argument, Plaintiffs assert the FEIS/R violates both CEQA and NEPA. *Id.* at 28. The CEQA standards discussed above are equally relevant to this issue. In general, the applicable NEPA standards are similar. An EIS must first describe the baseline conditions of the affected environment. 40 C.F.R. § 1502.15; *see also Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988) ("Without establishing the baseline conditions which exist in the vicinity of [a project] before [project operations begin], there is simply no way to determine what effect the [project] will have on the environment and, consequently, no way to comply with NEPA."). It is less clear to what extent NEPA specifically requires the baseline to reflect conditions as they are projected to change over time. Plaintiffs point to a Draft Guidance issued by the Council on Environmental Quality ("CEQ") in 2010, which advised as follows:

> When assessing the effects of climate change on a proposed action, an agency typically start[s] with an identification of the reasonably foreseeable future condition of the affected environment for the "no action" alternative based on available climate change measurements, statistics, observations, and other evidence. *See* Considering Cumulative

5

Effects (CEQ 1997) at www.nepa.gov. The reasonably foreseeable
affected environment should serve as the basis for evaluating and
comparing the incremental effects of alternatives. 40 CFR § 1502.15.

"Draft NEPA Guidance On Consideration of The Effects Of Climate Change And Greenhouse Gas

Emissions," (Feb. 18, 2010)(available at https://ceq.doe.gov/docs/ceq-regulations-and-

guidance/20100218-nepa-consideration-effects-ghg-draft-guidance.pdf)(hereinafter "Draft Guidance")

(emphasis added). However, the Draft Guidance was withdrawn on April 5, 2017 by the CEQ in light of

Executive Order 13783 (Promoting Energy Independence and Economic Growth, 82 Fed. Reg. 16,093

(Mar. 31, 2017)). *See* 82 Fed. Reg. 16,576 (Apr. 5, 2017).

With respect to the FEIS/R's treatment of climate change, Plaintiffs point to record evidence in

the FEIS/R projecting specific, relevant impacts of climate change on California's water supply. ECF

No. 45 at 26. The FEIS/R reviews several major reports on the impacts of climate change on California,

each based on different global climate models and emissions scenarios, and presents the range of

projected changes. *See* AR 25861-25862. With respect to impacts of climate change on snowpack and

streamflow, the FEIS/R indicates:

> Snowpack and streamflow amounts are projected to decline because of
> less late winter precipitation falling as snow and earlier snowmelt
> (Melillo, Richmond, and Yohe 2014). In California, snow water
> equivalent (the amount of water held in a volume of snow) is projected to
> decrease by 16 percent by 2035, 34 percent by 2070, and 57 percent by
> 2099, as compared to measurements between 1971 and 2000 (Melillo,
> Richmond, and Yohe 2014). By the end of the century, late spring
> streamflow could decline by up to 30 percent (CEC 2011).

AR 25864. Plaintiffs' comments on the draft EIS/R suggested that these figures could be used to

calculate projected loss of snowpack over the life of the Project, as snowpack water content is a factor in

surface water supply projections. AR 21832. Instead of doing so, the FEIS/R acknowledges that

"changes to annual temperatures, extreme heat, precipitation, sea level rise and storm surge, and

snowpack and streamflow are expected to occur in the future because of climate change," but concludes:

"Because of the short-term duration of the Proposed Action (10 years), any effects of climate change on

[the Proposed Action]alternative are expected to be minimal. Impacts to the Proposed Action from climate change would be less than significant." AR 25874. Again, this conclusion appears to be in conflict with the data disclosed in the FEIS/R itself. With snow water equivalent predicted to decline by 16 percent by 2035, one cannot escape the obvious deduction that snow water equivalent is likely to decline by some (possibly significant) fraction of 16 percent by the end of the Proposed Action: 2024. Defendants fail to point to record evidence to support the FEIS/R's conclusory and seemingly overblown assertion that: "It is certainly possible that the next ten years may be the driest on record, potentially influenced to an unknown extent by climate change, but it would be speculative to develop hydrology for the period of analysis in the EIS/EIR (2015-2024) as a series of 10 consecutive critical years based on potential climate change." AR 27429; ECF No. 48 at 17. The cited page from the AR (27429) contains no explanation of or support for this conclusion, leaving the Court with no basis upon which it could find this conclusion to be supported by substantial evidence.

None of the responses provided in the existing briefs is helpful. The Authority argues that climate change is addressed in Section 3.6 of the FEIS/R and "through modeling." ECF No. 48 at 17. The Court has reviewed the entirety of Section 3.6 and finds no justification for the apparent decision not to incorporate into the FEIS/R's <u>analysis</u> any information about projected climate change consequences the FEIS/R <u>itself</u> strongly suggests will occur over the time horizon of the Project. Likewise, the Court cannot discern from the record any evidence to support the implied assertion that the modeling used in the FEIS/R somehow accounts for, or otherwise renders irrelevant because of some modeling approach, the reasonably foreseeable impacts of climate change on California's water supply. Federal Defendants' apparent reliance on the fact that the climate change section of the FEIS/R is 20 pages long, *see* ECF No. 59 at 4, is also unhelpful, in part because a large portion of that section is dedicated to evaluating the impact on greenhouse gas emissions from the Project. This is not the target of Plaintiffs' challenge, and, as mentioned, the Court cannot find within this section a reasonable explanation for the key conclusion reached therein regarding the apparent refusal to incorporate climate

change projections into the baseline. Finally, the Authority's attempt to pivot away from the question at hand is unmoving. The Authority explains that "modeling is theoretical and water projects are managed in real time," before arguing that a particular mitigation measure outlined in the FEIS/R is "designed to avoid and reduce impacts based on actual conditions at the time of transfer, rather than predicted conditions from the modeling effort." ECF No. 48 at 17. This begs the question of whether the baseline itself was appropriately defined.

Accordingly, the Court requests supplemental briefing on the following questions related to the incorporation of climate change into the baseline utilized in the FEIS/R.

- In light of the record evidence cited in the FEIS/R projecting climate change impacts to certain aspects of California water supply over a time horizon not more than twice as long as the Project itself, what record evidence exists to support the FEIS/R's apparently contradictory decision not to adjust the project baseline to reflect changes in water supply conditions projected to result from climate change?

- To what extent do the existing modeling approaches incorporate foreseeable climate change impacts into the baseline?

- In light of the withdrawal of the Draft Guidance, to what extent does NEPA still impose upon Federal Defendants a responsibility to incorporate reasonably foreseeable climate change impacts into the baseline?

## CONCLUSION AND ORDER

Defendants are directed to submit supplemental briefs, not to exceed fifteen pages in length, on or before August 31, 2017. Plaintiffs may respond with a brief of equal length on or before September 20, 2017.

IT IS SO ORDERED.

Dated:  __July 14, 2017__                        _____/s/ Lawrence J. O'Neill_____
                                        UNITED STATES CHIEF DISTRICT JUDGE